**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LINDA PERKINS,** | |
| **Plaintiff,** | **CIVIL ACTION NO. _____** |
| **v.** | |
| **WHITE AND WILLIAMS LLP,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

## COMPLAINT & JURY DEMAND

Plaintiff Linda Perkins, by and through her undersigned attorneys, Bell & Bell LLP,

hereby files the following Complaint and Jury Demand ("Complaint").

## PRELIMINARY STATEMENT

1.  This is an action for an award of damages, attorneys' fees, and other relief on behalf of

    Plaintiff Linda Perkins (hereinafter "Ms. Perkins" or "Plaintiff"), a current employee of

    White and Williams LLP (hereinafter "White and Williams" or the "Firm" or

    "Defendant") who is employed as Counsel at White and Williams' Philadelphia,

    Pennsylvania office location.  Ms. Perkins has been harmed by Defendant's

    discrimination and harassment on the basis of her race and by Defendant's retaliation

    against Ms. Perkins because of her complaints regarding race discrimination and

    harassment.  This action arises under the Civil Rights Act of 1866, 42 U.S.C. § 1981

    ("Section 1981").[1]

---

[1] Ms. Perkins has also filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission regarding sex and race discrimination, harassment and retaliation.  In that Charge, which she dual-filed with the Pennsylvania Human Relations Commission, Ms. Perkins alleges that Defendant violated the Pennsylvania Human Relations Act ("PHRA") and Title VII of the Civil Rights Act of 1964, as amended ("Title VII").  Ms. Perkins intends to seek leave to amend this pleading to add her claims pursuant to the PHRA and Title VII once she has exhausted her administrative remedies with respect to those claims.

## JURISDICTIONAL STATEMENT

2.      This Court has original jurisdiction over all civil actions arising under the Constitution,

laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.

3.      The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which

grants the District Court original jurisdiction in any civil action authorized by law to be

commenced by any person to recover damages to secure equitable or other relief under

any act of Congress providing for the protection of civil rights.

4.      This Court has supplemental jurisdiction over any Pennsylvania state law claims pursuant

to 28 U.S.C. § 1367.

5.      All conditions precedent to the institution of this suit have been fulfilled.

## VENUE

6.      This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. §

1391(b) because the claim arose in this judicial district and Plaintiff is employed by

Defendant in this judicial district.

## PARTIES

7.      Plaintiff Linda Perkins is an adult female citizen and resident of Philadelphia,

Pennsylvania and the United States of America.

8.      Defendant White and Williams LLP is a partnership duly organized and existing under

state law, that has a business address and headquarters at 1650 Market Street, Suite 1800,

Philadelphia, Pennsylvania 19103, where Ms. Perkins is employed.

9.      Defendant White and Williams is a multi-practice law firm that was founded in 1899,

with over 240 lawyers in ten offices located throughout the United States.

10.     At all times relevant hereto, Defendant acted by and through its authorized agents,

servants and/or employees acting within the course and scope of their employment with

the Firm and in furtherance of Defendant's business.

11.   At all times relevant hereto, Defendant is and has been an "employer" and/or "person" within the meaning of the laws at issue in this matter, and is accordingly subject to the provisions of said laws.

12.   At all relevant times, Ms. Perkins was an "employee" within the meaning of the laws at issue in this matter, and is accordingly entitled to the protection of said laws.

## FACTS

13.   As described more fully herein, Ms. Perkins, an accomplished trial attorney, has been subjected to egregious racial discrimination and harassment by White and Williams – a homogenous, almost exclusively White, male dominated law firm.  Ms. Perkins has been marginalized, mocked, deprived of opportunities to develop her career and otherwise treated as a second-class attorney not deserving of the same opportunities as her White counterparts.

14.   After Ms. Perkins was left with no other choice than to complain about the discrimination and harassment she was experiencing, White and Williams unreasonably delayed investigating Ms. Perkins' concerns, taking nearly five months to conclude an "investigation" that appeared to be nothing more than a cursory exercise to find reasons to dismiss and minimize Ms. Perkins' complaints.  Instead of properly investigating and addressing Ms. Perkins' concerns, White and Williams used the investigative process as a vehicle to attack Ms. Perkins' work and to manufacture evidence of alleged performance deficiencies.

15.   Since Ms. Perkins' complaints, White and Williams has taken further steps to retaliate against Ms. Perkins and otherwise continues to marginalize her as an African American

woman by shunning her and shutting her out of almost all meaningful work and professional opportunities.

16.   By way of background, White and Williams is a firm dominated by non-minority, non-African American, male attorneys.  Of the 103 partners at the Firm, only 1 is African American.  In Philadelphia – a city in which African American residents outnumber any other race – White and Williams has 67 partners and only one of them is African American.  There are no African American, female partners employed by White and Williams at any of their 10 offices and, to Ms. Perkins' knowledge, in its entire 120-year history, there has never been an African American, female partner at the Firm.  When Ms. Perkins joined White and Williams, there were only two other African American, female attorneys, making her the third and most senior.  Sometime in 2017, one of those Associates moved to a new firm, leaving Ms. Perkins and another Senior Associate as the only two Black female attorneys Firm-wide.

17.   Ms. Perkins is a highly experienced trial attorney with over sixteen years of supervisory experience as a department chief with the Philadelphia District Attorney's Office and seven years as a partner at a prestigious regional law firm performing complex litigation work prior to joining White and Williams as Counsel in its Philadelphia headquarters in February of 2017.

18.   Throughout her exemplary legal career of over thirty years, Ms. Perkins has been a zealous advocate for her clients, demonstrated a high level of skill in her practice areas, and carried out her duties in an excellent manner.

19.   Ms. Perkins joined White and Williams as Counsel at the Firm's Philadelphia headquarters on February 1, 2017.

20.   Ms. Perkins made the move to White and Williams along with another partner from her former firm, "Attorney A", with whom she had been working extremely closely at her former firm on, among other matters, Special Master appointments in federal District Court for the Eastern District of Pennsylvania. With Ms. Perkins' assistance, Attorney A was appointed Special Master for a large scale, Multi District Litigation ("MDL Matter") of high complexity and importance. Attorney A specifically asked the appointing Judge to include Ms. Perkins in the appointment order based on her performance on prior special master matters handled by Attorney A.

21.   Ms. Perkins was hired into the Commercial Litigation Department and the General Commercial Litigation, Cyber Law and Data Protection Practice Groups at White and Williams.

22.   Ms. Perkins joined White and Williams pursuant to the terms of a written employment agreement (hereinafter the "Agreement") dated December 28, 2016.

23.   The Agreement specified that Ms. Perkins would join White and Williams as Counsel in the Commercial Litigation Department at the Firm's Philadelphia office and be in the Commercial Litigation, Cyber Law and Data Protection Practice Groups.

24.   The Agreement had a target start date of February 1, 2017, and an initial term that lasted through December 31, 2018.  The Agreement specified that, provided Ms. Perkins met her annual hourly billing benchmarks of 1200 hours in 2017 and 1400 hours in 2018 and did not engage in any conduct constituting "cause", it would be expected that the term of the Agreement would extend through December 31, 2019.

25.   The Agreement specified that Ms. Perkins' annual base salary would be $230,000, paid semi-monthly, and that she would be considered for adjustment to her salary in January of 2018.  Additionally, Ms. Perkins was eligible for partially Firm-sponsored health, life

and disability insurance benefits and eligible to participate in the Firm's 401(k) Plan, which included a Firm matching arrangement.  Ms. Perkins was also eligible to receive a fee with respect to business she brought in to the Firm, and eligible for an annual performance-based bonus.

26. White and Williams also promised in the Agreement to "encourage and support" Ms. Perkins' business development efforts, including introducing her to Firm clients, providing access to the Firm's marketing and publicity resources, providing adequate financial and staffing support, and providing additional lawyers to work on such matters.

27. White and Williams also indicated in the Agreement that Ms. Perkins could be considered for partnership beginning during the Fall of 2018.

28. When Ms. Perkins agreed to make the move to White and Williams, she was assured by Defendant that despite the fact that she had extremely limited portable business and established clients, she would be given every opportunity and provided with resources needed to grow professionally and develop a book of business at the Firm.

29. Upon joining White and Williams, Ms. Perkins performed her duties, as she had throughout her career, in an exemplary and professional manner, seeking out ways to develop an area of expertise within the Firm and grow professionally as she had been led to believe she would be assisted by the Firm in doing.

30. Shortly after joining the Firm, it became clear to Ms. Perkins that she was not being assigned enough work to allow her to meet her annual billable hours requirement, to meet expectations of a lawyer of her capabilities, or to permit her to cultivate a book of business and develop professionally.

31. Ms. Perkins and Attorney A had a wealth of experience handling special master appointments from the extensive work they had done on it at their former firm.  Instead

of fostering Ms. Perkins' role in the MDL Matter and expanding upon it, White and Williams actively looked for ways to include other White associates of the Firm, despite Ms. Perkins not having sufficient work.

32.     As a result of White and Williams' refusal to assign Ms. Perkins any significant amount of work despite her stellar qualifications, she was forced to seek out any work that was available and essentially beg to be assigned work in order to attempt to meet her billable hours requirement.

33.     In addition to the Firm failing to provide Ms. Perkins with an appropriate amount of work, Ms. Perkins also observed that she was being relegated to performing work for White and Williams that was not taking advantage of her skill set, ability and experience level, but instead was more consistent with assignments given to a new Associate.

34.     Despite previously indicating to Ms. Perkins that she would be afforded the resources and opportunities to develop professionally and build a client base and book of business with White and Williams, the Firm failed to provide any such resources and opportunities to Ms. Perkins.

35.     Ms. Perkins was inexplicably not permitted to attend important client meetings and events even where she had preexisting contacts with the client that could have been useful to the client relationship.

36.     Ms. Perkins was excluded from panels that she was well qualified for and interested in being a part of.

37.     Notably, at social events attended by Ms. Perkins, Ms. Perkins' colleagues and supervisors at White and Williams failed or refused to introduce Ms. Perkins to existing and/or prospective clients.

38. In contrast to Ms. Perkins's treatment, White, male attorneys were routinely promoted by being spotlighted as subject matter experts, being introduced to important client contacts, invited to attend or speak on panels, and otherwise assisted in their professional development at the Firm.

39. With respect to the work she was able to secure, Ms. Perkins was repeatedly subjected to humiliation and a demeaning and disrespectful attitude as a result of being one of only two African American, female attorneys in a homogenous Firm comprised almost exclusively of White attorneys.

40. For example, as a result of being isolated and ignored by the Firm with respect to work opportunities, Ms. Perkins spent significant time attempting to bolster Firm business by writing scholarly articles and other content on various topics including Cyber Law.

41. Despite being of high quality and beneficial to the Firm, Ms. Perkins' articles were barely acknowledged, regarded as unimportant and irrelevant, and/or not used at all.

42. Some of Ms. Perkins' articles were ignored altogether, while others were delayed to the point of irrelevance.  On some occasions, she received no feedback or even acknowledgement of her work.

43. When Ms. Perkins attempted to follow up on her work, her communications were ignored or put off and her work was wasted.  For example, Ms. Perkins received approval from two attorneys to write an article regarding U.S. data protection laws passed following the European Union's General Data Protection Regulation ("GDPR").  Ms. Perkins wrote the article and submitted it, but it was rejected as not publication worthy.  Shortly after Ms. Perkins' article was rejected, a nearly identical article was published by a highly reputable international law firm experienced in data protection and cyber security.  Ms. Perkins was subsequently asked to transform her article into a web-based resource

8

platform for Firm clients, which she did as suggested, but the project was later abandoned by the Firm as requiring too much effort to maintain.  When Ms. Perkins was asked to serve as editor for the web-based resource platform, she immediately agreed to accept the assignment knowing that it would be a time-consuming endeavor.

44.     In July of 2018, approximately 180 days prior to December 31, 2018, the Chair of the Commercial Litigation Department, Michael Olsan, met with Ms. Perkins to discuss the relationship between Ms. Perkins and the Firm.

45.     During this meeting, Ms. Perkins raised her concerns with Mr. Olsan that she was being impeded in her ability to grow professionally, was being treated differently, and being shunned.

46.     In response, Mr. Olsan indicated that he would follow up on these concerns, but Ms. Perkins received no indication that Mr. Olsan had done anything to follow up on her concerns.

47.     To the extent that White and Williams claims that Ms. Perkins did not meet benchmarks for hourly billing set forth in the Agreement, it was White and Williams' own conduct of withholding work from Ms. Perkins and failing in its commitment to help her grow her business that led to Ms. Perkins' hourly billing totals.

48.     Mr. Olsan also asked Ms. Perkins during the July meeting if she would have interest in being part of a cybersecurity litigation team.

49.     Ms. Perkins eagerly accepted the offer and set to work preparing a Cyber Law Practice Group business plan that included cybersecurity litigation.  Ms. Perkins also promptly provided Mr. Olsan with reference materials relevant to cybersecurity litigation issues that he had previously requested from others at the Firm, but still had not received.

50.    Despite submitting her business plan to the practice group leaders in late August of 2018, Ms. Perkins did not receive any feedback or further follow-up.  Instead, in September of 2018, Ms. Perkins learned that the Firm would not be pursuing cybersecurity litigation work because it could not compete with other firms like Baker Hostetler and other large, New York City firms.

51.    On other occasions, when Ms. Perkins was assigned to work on matters and other projects requiring multiple attorneys, Ms. Perkins' suggestions for case strategy, case management and other ideas were met with hostility, rejected outright, or ignored by her White coworkers and partners.

52.    Ms. Perkins' White counterparts' input, on the other hand, was consistently praised and accepted.

53.    When Ms. Perkins' suggestions were later accepted despite previously being rejected when proposed by Ms. Perkins, Ms. Perkins was not given credit, which was instead given to White, male attorneys.

54.    In addition to White and Williams' treatment demonstrating a culture of White, male privilege at the Firm, Ms. Perkins overheard comments cementing that White and Williams is a workplace that rewards employees for being Caucasian and male.  For example:

    a.   Ms. Perkins overheard a number of attorneys comment on the extensive time period that African American attorneys spend as associates at White and Williams before (rarely) being elevated to higher-level positions.  There is demonstrable proof for this comment given that the Firm currently has only 1 African American partner, less than 5 African American Counsel, and no African American Senior Counsel.

10

b.  Ms. Perkins heard a white male partner dismiss and minimize an opposing party's claims for damages and make clear that he did not consider the Black Plaintiffs involved worthy of the recovery they would be entitled to under Pennsylvania law, because whatever amount they received was "found" money and should satisfy them.

c.  Ms. Perkins heard at least one other attorney at the Firm openly acknowledge during a Womens' Initiative event at DiBruno Brothers that "the only way to make partner here is if you have a penis."

d.  On another occasion, at a White and Williams event at the Union League (an entity with a history of exclusionary practices), the Firm gave several presentations touting their extensive efforts to develop talent at the Firm.  Ms. Perkins had to observe the Firm refer to several attorneys who were being "developed" at the Firm, none of whom were African American.

e.  A White, male partner of the Firm confirmed and commented on the Firm's history of a lack of diversity and discomfort with minority and female attorneys, commenting that Firm statements in the past relating to protected classes of employees have been "cringeworthy."

55.  White and Williams has a diversity committee.  Despite the fact that Ms. Perkins was one of the very few African American women at the Firm, and the only African American woman in a position higher than Associate, it was not until Ms. Perkins had been at the Firm for several months that they invited her to be a member of the diversity committee.

56.  During a diversity committee meeting, concerns were raised regarding a recent diversity and inclusion training session.  Specifically, a member of the diversity committee expressed concern over the lack of interest displayed by some attorneys who attended the

diversity and inclusion training session in an overflow room.  In the overflow room, several attorneys in attendance were not paying attention to the training, were performing other work, and loudly discussing things not related to the diversity training being presented.  As part of the committee's discussion of "next steps", Ms. Perkins observed that the value the Firm places on this type of training is very important because  either the training is intended to actually address biases and perhaps change minds, or it merely allows the Firm to represent that its attorneys have completed diversity and inclusion training.   At a different meeting sometime later, Managing Partner Patricia Santelle remarked that the Diversity Committee has had "difficult conversations," appearing to reference the comments that Ms. Perkins had made, and implying that they reflected tension and/or disputes at the meetings.

57.   Despite the significant obstacles she faced as a Black woman in the culture at the Firm described herein, Ms. Perkins continued to work tirelessly to establish herself and succeed in spite of the odds being stacked against her.

58.   Unfortunately, her efforts were met with further, open hostility.

59.   In December of 2017, Ms. Perkins was assigned to work on a project with respect to a particular client – "Client A" – that required attorneys to research and input information relating to a large number of jurisdictions into a form that was immediately accessible to the client.

60.   Despite the work on the project for Client A being an extreme underutilization of Ms. Perkins' skill set and experience, she began to work diligently on the task that she had been assigned.

61.   Almost immediately, Ms. Perkins identified a number of significant issues with work that had already been "completed" by other attorneys.

62. Ms. Perkins pointed out these issues to a White, male associate at the Firm who was also working on the project and suggested that because the information that she and other attorneys was immediately available for review by the client, it was troubling that if she put in correct information, it would conflict with incorrect information that had already been inputted by others.

63. The associate confirmed to Ms. Perkins that her conclusion that errors had been made was correct and that he would make the necessary corrections.  He also offered to take over Ms. Perkins' portion of the project to free her to work on another emergent matter that had an upcoming filing deadline.

64. On September 27, 2018, during a Commercial Litigation practice group bus trip to New York City for a social event, Ms. Perkins heard the same White, male associate unfairly and inaccurately recount his interaction with Ms. Perkins while on the bus – apparently not realizing that Ms. Perkins was on the bus or could hear his comments.

65. The associate openly mocked Ms. Perkins, and mischaracterized her as difficult and lazy based upon the incident with Client A's project to a group of mostly White, male attorneys, including a number of partners.

66. Ms. Perkins overheard a number of details that made her sure that the associate was speaking about her, including facts that were unique to her work on Client A's project.

67. Ms. Perkins' suspicions were further confirmed when the associate mentioned her by name and one of the partners with whom he was speaking suggested that "Linda" had simply failed to do the job she had been given without complaining.

68. Ms. Perkins heard another attorney on the bus (referenced below as "Attorney D") mockingly respond, "I mean, she had one job to do."

69.  During the associate's performance, no attorney, not even the partners who were present, attempted to defend Ms. Perkins or to stop the inappropriate mockery by the White, male associate.

70.  Instead, as the associate told his story, the other White, male attorneys repeatedly erupted into laughter.

71.  Ms. Perkins was humiliated and shocked at this experience, and spent the remainder of the bus ride weeping over the ridicule, disrespect and open disdain she was treated with, and wishing that she had not participated in the social event at all.

72.  For a brief time after the social event, Ms. Perkins struggled with how to proceed because she feared reprisal given the corporate culture that openly favored White, male attorneys.

73.  In November of 2018, however, Ms. Perkins came to the difficult decision that she could no longer endure the repeated, demeaning, disrespectful and humiliating conduct she was subjected to as a result of her race, including being forced to hear herself defamed and ridiculed by an associate to a group of White, male partners and other attorneys.

74.  As a result, Ms. Perkins submitted a written complaint of discrimination and harassment to Human Resources at White and Williams on November 26, 2018 specifically complaining that she felt the treatment she had been subjected to was a result of her race and sex.  Specifically, among other things, Ms. Perkins noted that:

   a.  "Introductions to existing clients have been limited to nonexistent.  And, at best, there has never been much more than very limited interest in including me as a working attorney on new engagements.  This has left me feeling isolated and ignored, so I have tried to focus my efforts on what I can do to independently introduce myself to others outside of the firm and the firm's clients.  Those efforts are barely acknowledged and seem to be regarded as unimportant and irrelevant."

14

b. "Others in the practice group seem to be held in high esteem for writing or co-authoring articles that are really no better than mine.  Nevertheless, my work is deemed insufficient or not useful for one reason or another."

c. "I have been held up for public ridicule on more than one occasion and I do not accept that it was unintentional.  Statements have been made at group meetings that were clearly criticisms of my work and conduct as an attorney at this firm."

d. "Regrettably, I am left to ponder the reasons why my work is shelved or otherwise ignored.  I believe the true reasons for this disparity are due to gender and racial discrimination."

e. "I would like to know what the process is for investigation and consideration of my concerns.  I do not take this step lightly.  I understand the seriousness of these allegations, and it is because I am very concerned about the impact all of this has had on my performance here, and on my career in general, that I have decided to bring these concerns to your full and collective attention in this manner."

75.   Following her complaints, over the next nearly five months, the Firm conducted an investigation that appeared designed to conclude that Ms. Perkins' complaints were unfounded and that Ms. Perkins was actually a problem employee despite her unblemished career of high-caliber work that has spanned over thirty years.

76.   The investigation was not conducted in a timely manner.  In response to her written complaint in November, White and Williams indicated that it was hiring an outside investigator to conduct an investigation into her claims, however, a number of weeks went by before Ms. Perkins received any contact from an investigator.

77. After nearly a month, Ms. Perkins was contacted by Human Resources regarding the investigator on December 19, 2018, proposing an interview with the investigator during a shortened Christmas holiday week when Ms. Perkins was scheduled to be out of town.

78. When Ms. Perkins was finally interviewed in early January of 2019, she recounted numerous episodes of unfair treatment and bias, including extensive details regarding the differential treatment, exclusion, isolation, lack of meaningful work, undermining of her work, shunning, differential treatment with respect to career development, and discounting of her ideas that she had experienced as a result of her race.  In addition, Ms. Perkins recounted the numerous comments she had heard while working for White and Williams that are indicative of racial and gender bias at the Firm.

79. More than two months (nine weeks) passed following this initial interview until Ms. Perkins was interviewed a second time on March 18, 2019.

80. While the investigation was ongoing, fewer and fewer people would speak to Ms. Perkins, she was given less and less work, and there were instances where it appeared that other attorneys were willing to work with Ms. Perkins, who then changed their position after Firm management became aware of their intention to do so.

81. Consistent with this pattern of retaliation and shunning of Ms. Perkins, despite Ms. Perkins' Agreement clearly indicating that it was expected that her employment would continue through December 31, 2019 unless she failed to meet the requirements of her Agreement or engaged in conduct considered to be cause, in early January of 2019, Mr. Olsan indicated to Ms. Perkins that he did not think she even needed a contract.

82. After her complaints, for the first time since she began working for the Firm, in an effort to retaliate against Ms. Perkins and create false reasons to criticize her conduct, Ms.

Perkins was chastised for allegedly failing to meet a pro bono requirement.  In reality, however, Ms. Perkins had more than met the pro bono requirement.

83. On April 5, 2019, more than four months after Ms. Perkins' written complaint to Human Resources, Ms. Perkins was finally advised of the conclusions of the investigation.

84. In connection with advising Ms. Perkins of the investigation's findings, Human Resources met with Ms. Perkins on April 5, 2019 and provided her with a one-page excerpt consisting of the Conclusion page of the investigator's report regarding her complaints about discrimination and harassment.

85. From the limited information provided in the single page of the twenty-two-page report, it was clear that Ms. Perkins' complaints were not taken seriously.

86. Ms. Perkins continued to be demeaned in the conclusion page of the report, including a statement by the investigator that Ms. Perkins was incapable of grasping basic concepts.

87. Further, the conclusion page of the report perpetuated the stereotype of the "Angry Black Woman" by portraying Ms. Perkins as extremely difficult to work with.

88. The conclusion page falsely claimed that the contention that Ms. Perkins was difficult to work with was documented in performance reviews that were not provided to her but which predate her written complaint to Human Resources.

89. Ms. Perkins was highly offended by not only the conclusions reached, but the dismissive tone of the conclusion page she was provided.

90. Ms. Perkins was shocked that nearly five months after raising her concerns about illegal discrimination and harassment, she received such a cursory conclusion that seemed to have limited the scope of the purported investigation primarily to the very narrow inquiry of whether or not she had heard or was told of any comments directed to her regarding her race or gender.

91.   Given that the investigation took nearly five months, and given the extensive information, including inappropriate comments relating to race and sex, Ms. Perkins would have expected that the scope of such an investigation would include basic inquiries regarding the discrimination and harassment she experienced that went beyond merely asking whether offensive comments were made to her regarding her race and/or gender.

92.   The question posed by the investigator was framed in a purposefully narrow way that was predisposed to reach a conclusion that Ms. Perkins was not subjected to any wrongful conduct, despite the extensive details recounted by Ms. Perkins during her interviews.

93.   The investigator completely ignored this, and focused solely on a lack of comments directed to Ms. Perkins related specifically to her race or sex.

94.   After presenting Ms. Perkins with the outrageous conclusion page of the report, White and Williams disingenuously requested to discuss with Ms. Perkins how to "plan a path forward" on April 5, 2019 – the day they provided the conclusion page.

95.   Because of the results reported in the one-page of the report that she was provided, and the apparent lack of a meaningful investigation into the issues she had raised during the two interviews with the investigator, Ms. Perkins complained, in writing, to Mr. Olsan and Ms. Santelle, and requested that she be provided with the full report and the documents upon which the investigator had allegedly relied.

96.   Ms. Perkins also requested that she be provided a copy of her personnel file to attempt to address the statements made by the investigator in the report's conclusion page.

97.   Ms. Perkins was contacted by Human Resources, who told her that while she would not be permitted to have a copy of her employee file, she would be permitted to review it.

98.   A meeting was scheduled to allow Ms. Perkins to review her personnel file on April 19, 2019 under supervision of White and Williams staff.

99.     When Ms. Perkins arrived, she was also provided with a copy of the investigator's full

report.  Although she requested copies of the documents relied upon by the investigator

that were referenced in the report, this request was denied by the Firm.

100.    A review of the full report confirms what Ms. Perkins had learned from the one-page

conclusion she was initially provided: (1) the investigation inappropriately focused on a

single, narrowly framed question designed to conclude that Ms. Perkins' complaints were

unfounded; (2) the investigator ignored several details and comments Ms. Perkins heard

that evidenced a culture of race and sex bias at the Firm; and (3) that based upon selective

interviews, the investigator had concluded that Ms. Perkins was difficult to work with

and incompetent.

101.    Upon being provided the full report and an opportunity to review her personnel file, Ms.

Perkins reviewed for the first time written performance reviews of Ms. Perkins submitted

by three other attorneys at the Firm.

102.    These reviews, by three white male partners, "Attorney B," "Attorney C" and "Attorney

D," which the Firm falsely claimed occurred prior to Ms. Perkins' complaints, were all

actually submitted almost immediately after Ms. Perkins made her written complaint of

discrimination and harassment to Human Resources.

103.    The reviews were extremely negative and rife with inaccuracies purposely designed to

align with White and Williams' narrative that Ms. Perkins was difficult to work with and

not a highly skilled attorney.

104.    The reviews were not only inconsistent with Ms. Perkins' actual performance, but are

also inconsistent with statements made to Ms. Perkins by the individuals who completed

the reviews.

105.   With respect to Attorney C, the investigator seemed to credit the idea that Ms. Perkins refused to work on a number of cases when she, in fact, had not and where these cases were, in reality, for a personal project of Attorney C involving one of his relatives.   These cases were time consuming and there was increasing concern over how the Firm would be able to recover its legal fees.   To the extent Ms. Perkins had concerns about the work, she kept another partner at the Firm informed and sought his advice on how to proceed.

106.   Likewise, with respect to Attorney B, the investigator credited very unfavorable interview information provided by Attorney B without considering the fact that in both her initial written complaint and during her interviews with the investigator, Ms. Perkins raised serious ethical concerns with respect to a matter she worked with Attorney B on. The investigator attempted to turn this around on Ms. Perkins and cast her as failing to report her concerns about Attorney B's ethical failure.   The investigator also ignored the substantial and effective contribution Ms. Perkins made to the matter. Further, Attorney B's negative review of Ms. Perkins, which Defendant claims was created prior to Ms. Perkins' complaint, was actually created after Ms. Perkins' complaint and after Attorney B was interviewed and asked about the ethical lapse.

107.   The investigator also placed significant emphasis on Ms. Perkins' alleged refusal to work on a motion over a weekend, after being directed to write the motion by Attorney D on Friday by email at nearly 6 p.m., with a deadline of close of business the following Monday.   Ms. Perkins was concerned with the extremely fast turnaround expected where she had not done any work on the matter for several weeks and would need significant time to get back up to speed.   More importantly, the investigator inaccurately recounts that Attorney D was unable to write the motion because he was "on another case."   In reality, Attorney D attempted (successfully) to pass the motion off on Ms. Perkins

because he wanted to prepare for an upcoming continuing legal education presentation for a Firm client the following week.  Notably, Ms. Perkins drafted the motion as directed.

108.   The investigator also accepted Attorney D's criticism of Ms. Perkins as difficult to work with and uncooperative because she had indicated she thought it would be impossible for her to handle a jury trial that was expected to begin the same week that Ms. Perkins' husband was already scheduled to be lead counsel on a high profile trial for his firm, and during which her daughter (and only child) was scheduled to go away to college for the first time.  Concerning the September 2018 bus ride to New York, the investigation report describes Attorney D as recalling only that he was sitting next to another male attorney "talking and laughing but [did] not remember talking about specific individuals."

109.   The interviews referenced in the full report include interviews of Ms. Perkins, and eight other White and Williams attorneys.

110.   Notably absent from the interviews conducted by the investigator was any interview of Attorney A – the attorney with by far the most experience working with Ms. Perkins. The investigation report also lacked any mention of interviews with two individuals in White and Williams marketing department who were aware of Ms. Perkins' publication efforts and the quality of her work and who were frustrated, as Ms. Perkins was, with the lack of feedback and delay getting Ms. Perkins' work published.

111.   Attorney C – one of the partners who submitted a particularly scathing performance review after Ms. Perkins complained that was relied upon by the investigator in reaching her conclusions – was also not interviewed as part of the investigation even though Attorney C was on bus ride to the practice group social event in September 2018.

112.    The investigation report details many negative comments about Ms. Perkins by Mr. Olsan, but inexplicably does not include any account from Mr. Olsan concerning the September 2018 bus ride or the practice group social event held in New York.  Mr. Olsan was present on the bus ride and seated in the area of the bus where the remarks about Ms. Perkins were made to the delight of her White male colleagues.

113.    Notably, the investigation report also does not include interviews from any of the other attorneys who were also present on the bus ride and may have been able to corroborate some portion, if not all, of Ms. Perkins' account.  Instead, the report relies upon the self-serving statements of two attorneys at the epicenter of Ms. Perkins' complaint about the bus trip.  The White male associate, who Ms. Perkins has alleged deliberately maligned her, admitted to the investigator that he told a story about work on the same project, but he insisted that he was describing interactions with a different Firm employee.  As for Attorney C, while he admitted to "talking and laughing" on the bus, the report does not include any follow up description or account from Attorney C concerning the substance or topic of the "talking and laughing", the extent of his participation in the "talking and laughing" or if it related to the story recounted by the White male associate.

114.    Despite listing 24 documents reviewed as part of her investigation, almost no reference is made to any of the 24 documents in the report.  Instead, the full report appears to consist almost entirely of cherry-picked statements from the interviews, followed by a single page conclusion exonerating White and Williams and harshly criticizing Ms. Perkins.

115.    In the recitation of the interviews, the investigator focused on the task of ignoring Ms. Perkins' concerns that included evidence of race and gender bias, instead turning the narrative around on Ms. Perkins to cast blame on her for any purported discrimination or harassment.  For example, the investigator underlined interview question responses that

she believed may be particularly damning to Ms. Perkins.  With respect to several of the attorneys who were interviewed, the investigator placed emphasis on the fact that these individuals "never heard anything said about Ms. Perkins' gender or race" or words to that effect, including underlining the text of the responses.

116.    Despite taking great care to underline and emphasize interview responses that were particularly unhelpful to Ms. Perkins' claims, the investigator was equally careful to deemphasize and bury responses that cast Ms. Perkins in a positive light or supported her claims.  In particular, while underlining responses that indicate the interviewees did not hear anyone make comments about Ms. Perkins' race or gender, the investigator did not similarly emphasize information supportive of Ms. Perkins' position.  For example, the investigator failed to highlight comments by one attorney that Ms. Perkins was not difficult to work with and comments by another attorney indicating she found Ms. Perkins responsive to her request to assist on a project.

117.    In an even more telling contrast, despite there being ample evidence provided by Ms. Perkins during her interview that would demonstrate an illegal, hostile atmosphere at White and Williams, the investigator did not underline a single statement by Ms. Perkins that would be supportive of her claims.  For example, Ms. Perkins' responses regarding comments evidencing race and gender bias were not emphasized with underlining.  The investigator did, however, underline a number of responses by Ms. Perkins that she thought were particularly unhelpful and supportive of the narrative designed to dismiss Ms. Perkins' complaints.

118.    The investigator appeared willing to accept as true explanations lacking all credibility with respect to several of Ms. Perkins' concerns.

119. In addition to the above shortcomings of the investigation and report, there are other facts that cast further doubt on the legitimacy of the investigation and conclusions reached. For example, the investigator concluded that Ms. Perkins' complaints were unfounded, and accused Ms. Perkins of being difficult to work with and incompetent without even interviewing Attorney A – the individual who has by far the most experience working with Ms. Perkins and who would, to the predetermined results of the investigation's detriment, be the most willing (and most able) individual to make positive comments regarding Ms. Perkins' demeanor and capabilities.

120. Ms. Perkins has been told by Attorney A, a well-respected attorney, that if she was at a different firm or had the appropriate support at White and Williams, her career would be on a different trajectory.

121. Since her complaints, and following the investigation's conclusion, Ms. Perkins continues to be subjected to discrimination, harassment and retaliation by White and Williams.  For example, among other things, Ms. Perkins continues to be ignored and marginalized, White and Williams continues to fail to provide necessary resources for Ms. Perkins to succeed and Ms. Perkins continues to be treated less favorably than her White, male counterparts.

122. The Firm has placed Ms. Perkins in an untenable situation by subjecting her to continuing antagonism and efforts to demean her and her work. Among other things, the Firm's unfounded claims that Ms. Perkins is difficult to work with, that her work is unacceptable, and that certain partners are unwilling to work with her, have contributed to an increasingly hostile work environment.

123. Ms. Perkins has been discriminated against and harassed on the basis of race, and retaliated against because of her complaints in violation of Section 1981.

124.   Ms. Perkins has suffered and continues to suffer mental anguish and severe emotional distress as a proximate result of the actions and inactions of Defendant.

125.   Defendant's agents and employees all acted with the intent of causing, or in reckless disregard of the probability that their actions would cause Ms. Perkins severe emotional distress.

126.   Ms. Perkins has suffered financial losses including, among other things, lost wages, lost opportunities, and an obligation for attorneys' fees and costs of bringing suit as a proximate result of the actions and inactions of Defendant.

**COUNT I**
**Civil Rights Act of 1866, 42 U.S.C. § 1981**

127.   Plaintiff Linda Perkins repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

128.   Based on the foregoing, Defendant White and Williams LLP has engaged in unlawful employment practices in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981.

129.   In discriminating against and harassing Ms. Perkins on the basis of her race, and in retaliating against Ms. Perkins for complaining about racial discrimination and harassment, Defendant violated the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981.

130.   Said violations were intentional and willful.

131.   Said violations warrant the imposition of punitive damages.

132.   As the direct and proximate result of Defendant's violations of Section 1981, Plaintiff Linda Perkins has sustained a loss of earnings, severe emotional and psychological

distress, loss of self-esteem, loss of future earning power, as well as interest due thereon

along with and/or in addition to the damages and losses set forth herein.

133.   Plaintiff Linda Perkins is now suffering and will continue to suffer irreparable harm and

monetary damages as a result of Defendant's actions unless and until this Court grants the

relief requested herein.

## PRAYER FOR RELIEF

134.   Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs

as fully as though the same were set forth at length herein.

**WHEREFORE**, Plaintiff Linda Perkins respectfully requests that this Court enter

judgment in her favor and against Defendant and Order:

a.   Appropriate equitable relief;

b.   Defendant compensate Plaintiff with a rate of pay and other benefits and

emoluments of employment to which she would have been entitled had she not

been subjected to unlawful discrimination, harassment and retaliation;

c.   Defendant compensate Plaintiff with the wages and other benefits and

emoluments of employment lost because of its unlawful conduct;

d.   Defendant pay Plaintiff punitive damages;

e.   Defendant pay Plaintiff compensatory damages for future pecuniary losses, pain

and suffering, inconvenience, mental anguish, loss of employment and other

nonpecuniary losses as allowable;

f.   Defendant pay Plaintiff's costs of bringing this action and her attorneys' fees;

g.   Plaintiff be granted any and all other remedies available pursuant to Section 1981;

and

h.   Such other and further relief as is deemed just and proper.

## JURY DEMAND

135.    Plaintiff Linda Perkins hereby demands trial by jury as to all issues so triable.


BELL & BELL LLP


By:    _____
Jennifer C. Bell, Esquire
1617 John F. Kennedy Blvd. – Suite 1254
Philadelphia, PA 19103
(215) 569-2500

*Attorneys for Plaintiff*
*Linda Perkins*

DATE:   May 28, 2019